# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| STACIA-ANN CHAMBERS, ) | |
| 5865 Trinity Parkway, Apt. 245 ) | |
| Centreville, Virginia 20120, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| DXC TECHNOLOGY SERVICES, LLC, ) | |
| 1775 Tysons Blvd ) | |
| Tysons Corner, Virginia 22102, ) | |
| ) | |
| SERVE: ) | |
| CORPORATE CREATIVE SERVICES INC., ) | Civil Action No. |
| Registered Agent ) | |
| 6802 Paragon Place, Ste. 410 ) | |
| Richmond, Virginia 23230, ) | **JURY TRIAL DEMANDED** |
| ) | |
| and ) | |
| ) | |
| WILLIAM L. DECKELMAN, JR., ) | |
| 7800 Meritage Lane ) | |
| McLean, VA 22102, ) | |
| ) | |
| and ) | |
| ) | |
| MICHAEL SALVINO, ) | |
| 1775 Tysons Blvd ) | |
| Tysons Corner, Virginia 22102, ) | |
| ) | |
| and ) | |
| ) | |
| MICHAEL LAWRIE, ) | |
| 1775 Tysons Blvd ) | |
| Tysons Corner, Virginia 22102, ) | |
| ) | |
| Defendants. ) | |
| ) | |

# COMPLAINT

COMES NOW Stacia-Ann Chambers, by counsel, and, pursuant to Rule 8(a) of the Federal Rules of Civil Procedure, sues Defendants DXC Technology Services LLC ("DXC"), William Deckelman, Jr. ("Deckelman"), Michael Lawrie ("Lawrie"), and Michael Salvino ("Salvino) (together, the "Defendants") for their failure to pay Ms. Chambers overtime wages in violation of the Fair Labor Standards Act (the "FLSA"), unlawful retaliation against Ms. Chambers following her having raised concerns regarding such FLSA overtime violations, and cancellation of Ms. Chambers' health insurance benefits in violation of the Family Medical Leave Act (the "FMLA"), and, for her Complaint against the Defendants, states as follows:

## INTRODUCTION

1. This action arises from Defendants' unlawful conduct toward Ms. Chambers during her six-year tenure as an assistant to DXC's legal department and its General Counsel. Notwithstanding numerous complaints by Ms. Chambers over the course of her employment, DXC failed to compensate Ms. Chambers fairly compared to her similarly situated colleagues, none of whom were African American or single parents, like Ms. Chambers. Instead, Defendants continued knowingly to misclassify Ms. Chambers as an exempt employee and refused to pay her overtime wages, despite routinely paying such amounts to other employees with comparable roles and seniority, all of whom earned more than Ms. Chambers and the majority of whom assumed more discretion in the performance of their job duties. Worse still, Defendants retaliated against Ms. Chambers as a result of her having complained about her non-receipt of overtime pay by fostering a hostile work environment adverse to Ms. Chambers and imposing a Sisyphean work schedule to coerce her resignation. Finally, only a few weeks after Ms. Chambers commenced approved FMLA leave, and in

furtherance of its malicious campaign against her, DXC unlawfully cancelled Ms. Chambers' employee health insurance without advance notice, rendering her liable for significant out-of-pocket medical costs. Ms. Chambers has brought this lawsuit to obtain damages caused by Defendants willful violations of federal employment law, and further seeks an award of exemplary damages to deter such misconduct by Defendants in the future.

## PARTIES

2. Ms. Chambers is an individual and a citizen of the Commonwealth of Virginia with her primary residence located at 5865 Trinity Parkway, Apt. 245, Centreville, Virgin99ia 20120.

3. Upon information and belief, DXC is a Delaware limited liability company with its principal place of business located at 1775 Tysons Blvd, Tysons Corner, Virginia 22102.

4. Upon information and belief, Deckelman is General Counsel for DXC and a citizen of the Commonwealth of Virginia.

5. Upon information and belief, Salvino is President and Chief Executive Officer of DXC and a citizen of the State of North Carolina.

6. Upon information and belief, Lawrie is the Chairman of the Board of Directors of DXC and the company's former Chief Executive Officer, and is a citizen of the State of Florida.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over Ms. Chambers' claims for unpaid overtime wages arising under the Fair Labor Standards Act and for violations of the FMLA pursuant to 28 U.S.C. §1331.

8. This Court has general personal jurisdiction over DXC because the company is a citizen of Virginia with its principal place of business located in Tysons Corner, Virginia.

9. This Court has general personal jurisdiction over Deckelman because he is a citizen of

Virginia with his primary residence located within Fairfax County, Virginia.

10. This Court has specific personal jurisdiction over Salvino pursuant to Va. Code. Ann. § 8.01-328.1 because he regularly transacts business within this jurisdiction, including serving as President and CEO of DXC, and Ms. Chambers' claims for unpaid overtime wages and violations of the FMLA arise from such activities undertaken by Salvino.

11. This Court has specific personal jurisdiction over Lawrie pursuant to Va. Code. Ann. § 8.01-328.1 because he regularly transacts business within this jurisdiction, including having served as President and CEO of DXC during much of the time period during which Ms. Chambers' claim for unpaid overtime wages arose, and by serving as the current Chairman of the Board of Directors of DXC.

12. Venue lies in this District under 28 U.S.C. § 1391(b)-(d), and L. Civ. R. 3(C), because a substantial part of the events or omissions giving rise to the claims set forth in this Complaint occurred in this judicial District and in this Division. Specifically, such claims arise from Ms. Chambers' employment with Defendants which, at all relevant times, was carried out from DXC's headquarters in Tysons Corner, Virginia.

**FACTS**

13. Ms. Chambers is a .African American female and an experienced paralegal and administrative support professional.

14. Ms. Chambers is, and was at all relevant times, a single mother of a young daughter with a chronic disability, panhypopituitarism with adrenal insufficiency, requiring ongoing and extensive medical treatment.

15. Specifically, due to the severe nature of the condition suffered by Ms. Chambers' daughter and the specialized care needed to treat and manage this disability, Ms. Chambers is required

to travel with her daughter several times a year to the State of Florida to obtain treatment by dedicated specialists.

16. Despite these familial obligations, Ms. Chambers' work performance has consistently met or exceeded her employers' expectations throughout her career, and she proved capable of meeting challenging work requirements despite the inherent demands of being a single parent of a young, disabled child.

## Ms. Chambers' Employment with DXC

17. In November 2013, Ms. Chambers accepted employment with DXC as a "Senior Associate" in the company's legal department – a position reporting directly to Deckelman.

18. As a direct report to Deckelman, the terms and conditions of Ms. Chambers' employment were subject to modification only by Deckelman and DXC's CEO.

19. Lawrie served as CEO of DXC from the commencement of Ms. Chambers' employment through September 2019, after which time Salvino assumed the CEO position through the date of this filing.

20. The Senior Associate position was expressly non-exempt under the FLSA and Ms. Chambers was therefore entitled to overtime wages for all hours worked in excess of 40 hours per week.

21. Pursuant to the written terms of Ms. Chambers' Senior Associate position, DXC paid Ms. Chambers an annual salary of $75,000 and provided standard company benefits, including the ability to enroll in DXC's employee group health plan.

22. At the time of her hire by DXC, or shortly thereafter, Ms. Chambers enrolled herself and her daughter in DXC's group health insurance plan and continued to maintain coverage through the group health insurance plan throughout her employment with DXC.

23. Pursuant to this benefits plan, DXC paid a portion of Ms. Chambers' monthly health insurance premiums, and deducted employee contributions from her biweekly salary payments.

24. Despite offering Ms. Chambers employment with the company, DXC made no secret of its skepticism about Ms. Chambers' ability to excel in the company's demanding work environment given her familial obligations and status as a single mother, which Ms. Chambers disclosed to DXC prior to commencing employment in 2013.

25. In fact, during Ms. Chambers' onboarding with DXC immediately following her acceptance of employment, the company's HR Business Partner for its legal department, Dee Butterfield, cautioned Ms. Chambers that DXC's work environment was notably demanding and a questionable fit for a single mother.

26. DXC managers and executives parroted this sentiment and repeatedly expressed doubt with respect to Ms. Chambers' longevity with the company throughout her six-year tenure.

**Ms. Chambers' Senior Professional Role**

27. Due to her exemplary performance following her hiring, DXC promoted Ms. Chambers to the role of Senior Professional in Executive Administration in December 2014.

28. Pursuant to the written job description provided to Ms. Chambers, the Senior Professional position to which DXC elevated Ms. Chambers would ostensibly require her to assist Deckelman with his obligations as DXC's General Counsel, and contemplated Ms. Chambers' wielding considerable discretion in the performance of her duties, including making non-ministerial decisions of importance during Deckelman's absences.

29. DXC's description of the Senior Professional role was consistent with the functions performed by other executive assistants based in DXC's Tysons Corner headquarters, all of whom were assigned to assist only one DXC executive.

30. However, notwithstanding the limited role articulated in the Senior Professional job description, DXC instead tasked Ms. Chambers with supporting the company's entire legal department in Tysons Corner.

31. For example, in or around October 2019, Ms. Chambers regularly supported almost a dozen DXC managers in addition to Deckelman, including an Executive Vice President and Assistant General Counsel, a Vice President of Ethics & Compliance, a Vice President of Internal Audits, a Vice President of Litigation, a Senior Employment Attorney, a Vice President of Legal, and Vice President of Securities, M&A, and Real Estate, a Cyber Specialist, and a Director of Finance and Operations (the "L3 Managers").

32. Unlike Ms. Chambers, all other Executive Assistants employed at the company's Tysons Corner headquarters supported a single executive and were not regularly required to assist the L3 Managers.

33. However, upon information and belief, due to both the staffing levels of DXC's Tysons Corner headquarters and Deckelman's frequent travel outside the country, Ms. Chambers primarily served as a general legal assistant to DXC's legal team and related L3 Managers.

34. In providing general assistance to the L3 Managers and Deckelman, Ms. Chambers was typically tasked with only clerical functions that required the exercise of little discretion in their completion, such as data-entry, notarizing documents, and accepting service of process on behalf of DXC and its executive team.

35. Deckelman also routinely assigned Ms. Chambers clerical work in furtherance of his personal businesses, including a luxury yacht rental company in the Cayman Islands he operates with his wife.

36. Deckelman further tasked Ms. Chambers with finalizing and proofreading Deckelman's coursework in furtherance of his graduate studies at the London School of Economics.

37. Ms. Chambers did not attend meetings on Deckelman's behalf or otherwise make independent decisions of significance or exercise discretion with respect to the operations of DXC in the stead of any DXC executive.

38. Ms. Chambers did not supervise any employees as a Senior Professional and was not otherwise provided the means to delegate work to other employees.

39. Due to the demanding nature of her position and the number of senior-level staff she was required to support, Ms. Chambers routinely worked approximately 60 hours per week, including on weekends and while on vacation.

40. DXC also required Ms. Chambers to carry out her job duties remotely during every trip she made with her family to Florida to obtain specialized treatment for her daughter's disability.

**DXC's Disparate Compensation of Ms. Chambers**

41. Ms. Chambers' Senior Professional role initially commanded a salary of $90,800, which was subsequently increased to $108,000 in 2017 as a result of Ms. Chambers' exceptional performance.

42. Upon information and belief, DXC paid overtime to all other assistants of similar seniority to Ms. Chambers located in DXC's Tysons Corner headquarters.

43. DXC did not pay Ms. Chambers any overtime wages despite the non-exempt nature of her duties and her regularly being required to work in excess of forty hours per work week.

44. Unlike Ms. Chambers, who performed a general assistant function for the entire legal department, the senior executives at DXC's Tysons Corner headquarters who did receive overtime pay were assigned to assist only one DXC executive, and routinely exercised more discretion in matters of significance as opposed to the clerical tasks with which Ms. Chambers was typically tasked.

45. Upon information and belief, these senior executives also earned higher base salaries than Ms. Chambers, in addition to receiving overtime pay for all work they performed in excess of forty hours during a given workweek.

46. At all relevant times, Ms. Chambers was the only executive assistant based in DXC's Tysons Corner headquarters who was not paid overtime wages.

47. At all relevant times, Ms. Chambers was the only African American executive assistant based in DXC's Tysons Corner headquarters.

48. At all relevant times, Ms. Chambers was the only executive assistant who was a single parent of a disabled child based in DXC's Tysons Corner headquarters.

49. Upon information and belief, DXC's disparate compensation of Ms. Chambers with respect to her eligibility for overtime pay was willful and arose from unlawful motives related to Ms. Chambers' race, marital status and familial affiliation with her disabled daughter.

### Ms. Chambers' Complaints of Disparate Payment and DXC's Corresponding Retaliation

50. Ms. Chambers raised concerns with DXC's management team, including Deckelman, and its Human Resources Department on numerous occasions during her employment with the company.

51. In addition to questioning DXC's apparent classification of her role as exempt under the FLSA when her job duties were consistent with those of a non-exempt employee, Ms.

Chambers also questioned why all other executive assistants of similar seniority would be entitled to overtime wages given the company's refusal to pay Ms. Chambers such compensation.

52. Specifically, Ms. Chambers raised concerns about her ineligibility for overtime during regular meetings with Deckelman and/or Human Resources every summer and/or fall following her commencement of employment in 2013, including most recently in September 2019.

53. However, rather than investigate Ms. Chambers' complaints regarding her non-exempt status and/or compensate her equally relative to her similarly-situated colleagues, DXC disregarded Ms. Chambers concerns and frequently responded to such complaints by questioning the viability of Ms. Chambers' continued employment with DXC in light of her familial circumstances.

54. By way of example, during a September 30, 2019 meeting between Ms. Chambers and Mia Andrews, DXC's Global Human Resources Leader, Andrews informed Ms. Chambers she was not eligible for overtime, and that Ms. Chambers' needed to make an immediate decision as to whether DXC was a suitable employer given the "hard life" suffered by Ms. Chambers and her daughter.

55. Moreover, and in addition to effectively encouraging Ms. Chambers' resignation from the company during these personnel meetings, DXC management and senior employees responded to Ms. Chambers' complaints about her wages by incessantly berating Ms. Chambers in the workplace and imposing an increasingly onerous workload in an attempt to incentivize her departure.

56. Specifically, other employees who reported to Deckelman deliberately assigned Ms. Chambers mundane tasks, such as electronic data entry, that would require her to stay at DXC's headquarters late into the evenings and continue her work on weekends.

57. By way of further example, only a few weeks after Ms. Chambers' meeting with Andrews in September 2019, an assistant to the CEO abrasively instructed Ms. Chambers to make herself available for approximately 15 hours during a single workday to assist Salvino with a matter unrelated to Ms. Chambers' job function.

58. Additionally, a DXC HR Business Partner routinely confronted Ms. Chambers in the workplace and suggested she seek alternative employment given her familial commitments and the rigidity of DXC's work environment.

59. DXC management and other direct reports to Deckelman also mocked Ms. Chambers when she needed to alter her work schedule to care for her daughter, including absences to obtain medical treatment and in extenuating circumstances, such as the closure of schools in the area.

60. As a result of DXC's unabashed disparate compensation of Ms. Chambers, the company's willful disregard of her complaints regarding the same, and the resulting harassment by her colleagues and DXC management, Ms. Chambers developed a debilitating anxiety and stress-related disorder.

**DXC's Violation of the FMLA During Ms. Chambers' Leave of Absence**

61. On the recommendation of her physician, in October 2019, Ms. Chambers notified Deckelman and DXC's Human Resources Department that she needed to take FMLA leave through January 2020 to address her worsening anxiety condition.

62. Ms. Chambers made an express request to DXC's Human Resources Department that her anticipated leave be classified by the company as being taken subject to the FMLA, which request was acknowledged and approved by DXC.

63. Because Ms. Chambers utilized accrued paid leave for the first two weeks of her absence—with the knowledge and approval of DXC—Ms. Chambers received her full paycheck less her regular benefit deductions on November 8, 2019.

64. Pursuant to its standard benefits practice, DXC deducted the full amount of Ms. Chambers' contribution toward her November 2019 insurance premium from this November 8, 2019 paycheck.

65. Based on Ms. Chambers' numerous discussions with Deckelman during her DXC employment, both DXC and Deckelman had knowledge that Ms. Chambers' relied upon her employee health insurance to obtain regular treatment for her daughter's disability, which would otherwise be prohibitively expensive.

66. In early January 2020, DXC's Benefits Center transmitted an invoice to Ms. Chambers, apparently seeking payment of the value of her employee contributions that DXC could not deduct from her wages during the unpaid portion of Ms. Chambers' FMLA leave.

67. This January 2020 invoice was the first notification Ms. Chambers ever received from DXC regarding payment issues concerning her healthcare premiums.

68. Promptly after receiving this invoice, Ms. Chambers contacted the company's Benefits Center to arrange for the payment of any overdue employee contributions as of that date.

69. However, upon her contacting the Benefits Center, DXC informed Ms. Chambers that her family's enrollment in its group health plan had, in fact, been cancelled on November 11, 2019.

70. DXC's Benefits Center further informed Ms. Chambers that, following the commencement of her leave, the value of her employee contributions had been increased and that, to potentially reinstate her health insurance policy, Ms. Chambers would be required to retroactively pay these increased contributions toward her premiums for the time period during which DXC could not make deductions from her standard paychecks.

71. Because she was unaware that DXC had cancelled her insurance benefits only a matter of weeks after her leave of absence began, Ms. Chambers continued to obtain regular treatment for her anxiety disorder and her minor daughter's chronic health condition using her DXC employee insurance without making other arrangements.

72. As a result of DXC's cancellation of Ms. Chambers' health benefits, the health plan administrator rejected all invoices issued by Ms. Chambers' and her daughters' physicians for treatment obtained after November 11, 2019.

73. Accordingly, the healthcare providers who treated Ms. Chambers and her daughter since November 11, 2019 subsequently demanded payment of these uninsured costs from Ms. Chambers directly.

## COUNT I
**(Violation of FLSA 29 U.S.C. § 201, *et seq.*)**
**(Against All Defendants)**

74. Ms. Chambers hereby incorporates the allegations set forth in Paragraphs 1-73 in her Complaint as if fully set forth herein.

75. DXC is an "enterprise" as defined by the FLSA, 29 U.S.C. § 203(r)(1), and is engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(b), (s)(1).

76. At all relevant times, Deckelman was an "employer" of Ms. Chambers within the meaning of FLSA § 203(d).

77. Between December 2013 and September 2019, Lawrie, in his capacity as Chief Executive Officer of DXC, was an "employer" of Ms. Chambers within the meaning of FLSA § 203(d).

78. Following his appointment as Chief Executive Officer of DXC in September 2019 through the present day, Salvino served as an "employer" of Ms. Chambers within the meaning of FLSA § 203(d).

79. The FLSA requires covered employers, like DXC, to pay non-exempt employees, like Ms. Chambers, no less than one and one-half (1.5) times their regular rate of pay for all hours worked in excess of forty in a workweek.

80. Based on Ms. Chambers' function as a general legal assistant and the clerical nature of the tasks to which she was typically assigned, DXC should have classified Ms. Chambers as non-exempt under the FLSA and paid her overtime wages.

81. Ms. Chambers regularly worked more than forty hours per week for DXC.

82. However, Defendants did not properly compensate her for any overtime hours as required by the FLSA.

83. Defendants were aware, however, that all other executive assistants in DXC's Tysons Corner headquarters were paid overtime wages, despite those employees regularly performing functions more characteristic of exempt employees, as opposed to the primarily clerical role filled by Ms. Chambers.

84. Defendants instead willfully refused to pay Ms. Chambers overtime pay, despite knowing that she was entitled to such statutory wages, in an attempt to coerce Ms. Chambers' voluntary departure from the company.

85. Ms. Chambers has been damaged in the amount of the value of overtime wages Defendants failed to pay her for the past three years, as will be ascertained in the trial of this matter.

## COUNT II
### (Retaliation – Violation of 15(a)(3) of the FLSA)
### (Against All Defendants)

86. Ms. Chambers hereby incorporates the allegations set forth in Paragraphs 1-85 in her Complaint as if fully set forth herein.

87. During her employment with DXC, Ms. Chambers lodged numerous complaints with Defendants through Deckelman regarding her non-receipt of overtime wages.

88. Given that all other executive assistants working from DXC's Tysons Corner headquarters received overtime pay and the relative clerical duties assigned to Ms. Chambers, she had a good-faith basis to believe that DXC had misclassified her position as exempt from the FLSA's overtime requirements, and that the company's calculation of her wages violated federal law.

89. Rather than address Ms. Chambers' complaints regarding her non-receipt of overtime, DXC instead created a hostile work environment in an effort to force Ms. Chambers' resignation, including repeatedly questioning her continued employment due to her familial responsibilities.

90. Upon information and belief, DXC also cancelled Ms. Chambers' enrollment in its group health insurance plan within a matter of weeks following the commencement of her leave in October 2019 without adhering to the notice provisions set forth under the FMLA in a further attempt to force Ms. Chambers' resignation.

91. DXC's retaliatory conduct caused Ms. Chambers severe emotional distress that ultimately necessitated an extended, unpaid leave of absence from her employment causing her damages in an amount that will be ascertained in the trial of this matter.

## COUNT III
### (Violation of the FMLA - 29 C.F.R. § 825.209(a))
### (Against DXC and Deckelman)

92. Ms. Chambers hereby incorporates the allegations set forth in Paragraphs 1-91 in her Complaint as if fully set forth herein.

93. On or around October 14, 2019, Ms. Chambers provided notice to DXC through Deckelman that she intended to take leave from her position through January 2020 to treat her worsening anxiety disorder.

94. In approving her request for leave through January 2020, DXC acknowledged that Ms. Chambers' absence was protected by the FMLA.

95. At the time Ms. Chambers' FMLA leave started, she and her daughter were enrolled in DXC's group health insurance plan.

96. DXC cancelled Ms. Chambers' enrollment in its insurance plan only three weeks after the commencement of her FMLA leave in October 2019, and a matter of days after Ms. Chambers' standard employee contribution was deducted from her November 8, 2019 paycheck.

97. DXC did not provide Ms. Chambers' with notice of any purported underpayment of her employee contributions toward her monthly insurance premiums prior to cancelling her enrollment in its employee health insurance plan in November 2019.

98. DXC did not provide Ms. Chambers' with notice of its intent to cancel her enrollment in the employee health insurance plan prior to cancelling her enrollment in its plan in November 2019.

99. Upon information and belief, upon the commencement of Ms. Chambers' FMLA leave, DXC caused and/or permitted an increase in the amount of Ms. Chambers' required employee contributions toward her monthly insurance premiums.

100. Despite Ms. Chambers' efforts to coordinate payment of any unpaid employee contributions due so as to maintain her family's insurance coverage, DXC refused to cooperate for at least several weeks, compelling Ms. Chambers and her daughter to remain without coverage for this period.

101. Accordingly, Ms. Chambers became liable for these health care expenditures and was required to pay these significant costs out of pocket.

102. DXC's cancellation of Ms. Chambers' health benefits and the corresponding financial repercussions caused Ms. Chambers' further emotional distress and exacerbated the symptoms of the anxiety disorder for which she was seeking treatment at that time.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Chambers respectfully requests that this Court enter judgment in her favor against all Defendants, jointly and severally, and prays for the following relief:

1) An award of compensatory damages for overtime wages unpaid during the three-year time period preceding the filing of this action in an amount to be determined in the trial of this action.

2) An award of the value of Ms. Chambers' incurred healthcare costs caused by Defendants' cancellation of Ms. Chambers' health insurance benefits in violation of the FMLA.

3) An award of monetary damages to compensate Ms. Chambers for the emotional distress she endured as a result of Defendants' violations of the FMLA and retaliatory conduct;

4) An award of punitive and/or liquidated damages due to DXC's willful violation of the FLSA under 29 U.S.C. § 260 and/or the FMLA under 29 U.S.C. § 2617;

5) An award of the reasonable attorney's fees and costs incurred by Ms. Chambers in prosecuting this action pursuant to 29 U.S.C. § 216(b) and/or 29 U.S.C. § 2617(a)(3); and

6) Such other damages as this Court deems just and proper.

Dated: February 6, 2020

Respectfully submitted,

_____/s/ David M. E. Moon_____
David M. E. Moon, Esq. Bar. No. 90138
Kathryn M. Lipp, Esq., Bar No. 80089
Ryen C. Rasmus, Esq., Bar No. 84346
THE LIPP LAW FIRM, PC
4000 Legato Road, Ste. 1100
Fairfax, Virginia 22033
Telephone: (703) 896-7704
david@lipplawfirm.com
katie@lipplawfirm.com
ryen@lipplawfirm.com
*Counsel for Plaintiff Stacia-Ann Chambers*